## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE BURKS COMPANIES, INC.,      :
191 Peachtree Street, Suite 800 :
Atlanta, Georgia  30330         :
                                :   CIVIL NO.: _____
    Plaintiff,                  :
                                :
v.                              :
                                :   **JURY TRIAL DEMANDED**
HOWARD UNIVERSITY,              :
2400 Sixth Street, N.W., Suite 440 :
Washington, D.C.  20059         :
                                :
SERVE:  John G. Gloster, Jr., Resident Agent :
      2400 Sixth Street, N.W., Suite 321 :
      Washington, D.C.  20059     :
                                :
    Defendant.                  :

### VERIFIED COMPLAINT FOR DAMAGES

    COMES NOW, The Burks Companies, Inc. (hereinafter "TBC"), Plaintiff in the above styled civil action, by and through undersigned counsel, and hereby files this Complaint against Howard University (hereinafter "HU or University"), and states as follows:

### PRELIMINARY STATEMENT

    1.    TBC brings this Complaint against HU to recover damages in the amount of **$12,736,691.73**, which includes its reasonable attorneys' fees and interest at the rate of 6% per annum, arising from HU's breach of agreements with TBC to manage all 12 areas of HU's physical facilities maintenance from January 1, 2013 through November 12, 2014, as well as HU's negligent misrepresentations and bad faith.  TBC has tried in good faith to resolve this matter, but HU has refused to pay for undisputed claims.

    2.    By way of background, in November 2010, HU, under the leadership of President Sidney A. Ribeau ("President Ribeau"), embarked on a strategy of facilities renewal and

restoration.  HU Senior Vice President Robert Tarola ("SVP Tarola") served as Chief Financial Officer and Treasurer with a mandate to stabilize and improve HU's financial condition.

3.      On or about December 2010, HU first approached TBC, a Georgia based corporation, to provide facilities management services to provide a cleaner, safer, more healthful environment.  At that time, HU lacked the facilities managerial expertise to compile a proper Request for Proposal ("RFP").

4.      On or about December 22, 2010, TBC met with HU to explain its "no bid" decision and to propose a solution.   HU engaged TBC to perform a "145-Day Diagnostic Assessment Report," a baseline assessment that would provide HU with the requisite data to prepare a full and comprehensive RFP for physical facilities management services.

5.      In the absence of this assessment, it was impossible for TBC or any other bidder, to submit a fair and complete RFP response.

6.      TBC's "145-Day Diagnostic Assessment Report," completed June 2011, identified $5 million of waste per year in HU's facilities maintenance programs.

7.      For example, TBC found 25%-30% of HU's labor was routinely showing up but not working, absent, or working other jobs and charging HU for hours not worked.

8.      Subsequently, TBC estimated deferred maintenance costs in the amount of $300 million.   These deferred maintenance costs mainly covered building infrastructure projects including, but not limited to, replacement costs for the HVAC, electrical, and plumbing, and building infrastructure items.  HU solicited support from TBC to identify "savings" to assist in addressing HU's significant deferred maintenance costs.

9.    In response to HU's request, TBC continued its efforts to provide cost saving initiatives to HU. In furtherance, thereto, TBC agreed to the "Gain Share"[1] arrangement as another means to raise funds for badly needed repairs for HU.

10.    Under the Gain Share formula proposed by HU, TBC and HU would share equally in the savings achieved in facilities management expenditures.  Pursuant to this arrangement, TBC invested significant resources and efforts to identify areas in which HU could save on facilities management.

11.    TBC steadfastly performed Gain Share work, as requested by HU.  Additionally, HU demanded "Out of Scope" services as HU experienced seismic shifts and sudden departures from its facilities management staff.  HU failed to pay for the Gain Share and "Out of Scope services," even though TBC performed with every expectation of being paid for its services and despite HU's clear contractual obligations to do so.

12.    Subsequently, TBC proposed a plan for Integrated Facilities Management ("IFM"), a fully integrated management and labor facilities maintenance program, including total outsourcing of labor.

13.    HU misappropriated TBC's proprietary plans for IFM by sharing them with third parties.  HU improperly misappropriated the proposed organizational structure by TBC for IFM services and incorporated this structure and other confidential data in its RFP.

14.    No payments have been made to date on either the Gain Share or Out of Scope Work. A summary of TBC's damages appears below:

---

[1] A "Gain Share" is a performance incentive fee to designed by HU to reward and compensate TBC for initiating cost savings measures in facilities management. Under the Gain Share Agreements approved by the parties, the savings in operating costs would be shared 50% - 50%.

SUMMARY OF TBC'S DAMAGES[2]

| TBC Damages | Claim Amount |
|---|---|
| Gain Share - Quarters ending 1/1/14 to 12/31/14 | $3,130,883.00 |
| Out of Scope Work | $4,233,430.00 |
| Phase II and Outsourcing Expenses | $3,188,000.00 |
| Management Fee - August 2014-November 2014 | $400,000.00 |
| Demobilization Costs | $221,648.00 |
| **Subtotal - Principal** | **$11,173,961.00** |
| Accrued Attorney's Fees & Costs (to date) | $54,245.99 |
| Interest (Pre-judgment Rate 6%) for the period July 1, 2014 to October 30, 2016. Interest Accrued Per Diem of $1,768.45 | $1,508,484.74 |
| **Subtotal - Attorney's Fees & Interest** | **$1,562,730.73** |
| **TOTAL - Principal, Attorney's Fees & Interest** | **$12,736,691.73** |

## THE PARTIES

15.     TBC is an entity incorporated under the laws of the State of Georgia, registered to transact business within the District of Columbia, and having its principal place of business at 191 Peachtree Street, Suite 800, Atlanta, Fulton County, Georgia 30303.

16.     HU is a co-educational, private, doctoral/research extensive university, organized and existing under the laws of the District of Columbia, with a principal place of business at 2400 Sixth Street N.W., Washington, D.C. 20059.  HU can be served through its Resident Agent as follows: John G. Gloster, Esq. 2400 Sixth Street, N.W., Suite 321, Washington, D.C. 20059.

---

[2] TBC's supporting calculations are attached hereto and incorporated herein as **Exhibit "A."** When prepared, Exhibit "A," and supporting materials totaled $10,799.411. The following adjustments have been made to the claim: subtracted $259,107 for 2013 Summer Readiness, but added $412,009 for 2014 Summer Readiness, "Out of Scope Work;" $221,648 added "Demobilization Costs;" added $54,245.99 "Attorneys' Fees;" and added $1,508,484.74 "Interest."

**JURISDICTION AND VENUE**

17.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (a)(1), insofar as the matter in controversy exceeds the sum $75,000.00 exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendant.

18.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims occurred herein.   Further, venue is appropriate as agreed to by the parties pursuant to the Agreements in this matter.

**FACTS**

A.   **Background**

19.   Established in 1991, TBC has become a leading provider of Physical Facilities Management Services ("PFMS"), a management-only structure using the client's existing workforce.   TBC also offers IFM services, a totally integrated service solution, allowing the client to outsource both the management and labor functions of facilities maintenance.

20.   TBC has employed over 600 employees and managed more than 26 million square feet of commercial/institutional space.   Through its performance, TBC strives to offer services that consistently exceed expectations while providing costs-savings initiatives that directly benefit the client.

21.   As set forth in HU's November 13, 2013 RFP for Physical Facilities and Environmental Services Management, "[s]ince its inception in 1866, HU has acted as a premier African-American institution of higher learning."

22.   Historically Black College & University (HBCU), located in Northwest Washington D.C., HU has grown from a single frame building to property and facilities, including 258 acres with 115 buildings and equipment, valued at more than 1.2 billion dollars." *Id*.

23.    In 1879, Congress approved a special appropriation for HU ("congressional funding"). The charter was amended in 1928 to authorize annual federal appropriations for construction, development, improvement, and maintenance of the University. Although it is a private university, pursuant to this congressional funding, HU has consistently received more than $200 million a year from Congress.

24.    No other HBCU receives this amount of congressional funding.

**B.    TBC Works with HU to Revitalize HU Facilities and Examine Cost-Savings Measures.**

25.    Beginning on February 7, 2011, HU contracted with TBC to perform physical facilities management services pursuant to a series of short-term agreements. These agreements were replaced by a Physical Facilities Management Consulting Agreement ("PFMCA"), in effect February 4 through June of 2013, amended A1 and A2, effective through August 2014.

26.    The PFMCA was replaced by a Master Facilities Management Consulting Agreement ("MFMCA"), effective July 1, 2013 through November 12, 2014.

27.    TBC's 145-day "Diagnostic Assessment Report" identified $300 million of necessary repairs. A sampling of TBC's work is represented by the "before" and "after" photos below showing "Mold Remediation" in the Allied Health Buildings offices spaces. (Significant mold was also found in laboratories, classrooms, and dormitories).

## Mold Remediation





2 Photos of "Before" – Mold Issues Not Remediated in Past Year

2 Photos of "After" the Cleanup





*Mold Removed, Cleaned, Repaired and Tested – Ready for Occupants*

## Water Damage





2 Photos of "Before" – Water Damage/Leaks

2 Photos "After" Remediation





*Root Cause of Leak Located and Repaired – Ready for Students*

**OSHA Violations**





### Residence Hall - Drew



2 Photos of "Before" – Holes in Shower / Wall



Remediated/Improved Space



*Bathrooms Remediated – Ready for Occupancy by School Opening*

### Water Conditions Prior to Treatment by TBC





28.   Following publication of its Diagnostic Assessment Report, TBC inventoried, barcoded, and recorded 10,000 unique building assets for HU and created new systems for HU's physical facility maintenance.

29.   SVP Tarola was impressed with the quality of work being performed by TBC and recommended an expansion of services by TBC.   HU agreed to this recommendation and expanded the scope of services being performed by TBC.

30.   Subsequently, SVP Tarola recommended the Gain Share arrangement between HU and TBC.   This arrangement was agreed upon by HU to empower TBC to seek other cost-saving solutions for HU's physical facilities.   Later, TBC and HU memorialized the terms of the Gain Share arrangement in the PFMCA and MFMCA agreements and accompanying amendments.

31.    As an example of the Gain Share agreement memorialized in PFMCA A1 and A2 and MFMCA, TBC strongly recommended that HU deny Honeywell's final pay application in the amount of $1,858,868.00.  This recommendation was made after thorough inspection of the project and review of all documentation, along with a determination that Honeywell had not performed as promised.

32.    Under the Gain Share arrangement, TBC was entitled to the sum of $929,434.00.

33.    TBC was never compensated for facilitating this cost-savings to HU.

34.    On or about January 15, 2013, Chris Calhoun ("Calhoun"), HU's Executive Director of Physical Facilities Management resigned with short notice.  SVP Tarola recommends TBC's Dennis Forrest ("TBC Forrest") assume Calhoun's role with all associated responsibilities.  TBC accepted its new role as head of HU's Facilities.  TBC Forrest is the head of HU's Facilities.  TBC and HU agreed that TBC would be compensated for these "Out of Scope" services.

35.    A true and correct copy of HU's Notice of Appointment, is attached hereto and incorporated herein as **Exhibit "B."**  A true and correct copy of HU's Organizational Chart showing Forrest as Head of HU's "Facilities," is attached hereto and incorporated herein as **Exhibit "C."**

36.    In this role, TBC Forrest manages "Out of Scope" work at the request and direction of HU.

37.    As indicated in the below excerpts, TBC delivered "exemplary performance" with "facilities management capabilities that far exceed anything HU had at its disposal."  Dr. Wayne Frederick, then HU's Interim President remarked, "Thank you!!! Excellent Service" upon TBC's successful restoration of heat to HU's Mental Health Clinic.

38.   Additional testimonials from HU staff and faculty praising TBC's work are attached hereto and incorporated herein as **Exhibit "D."**

*"Thank you!!! Excellent Service"*



Wayne A. I. Frederick, Sr., MD, MBA, FACS
**Interim President**

## (In response to a critical heat restoration at the mental health clinic)

throughout the day and evening at Blackburn. Please extend heartfelt thanks to your staff for all their efforts. Your hard work and tireless efforts insured that our guests were happy and comfortable and made Howard and its employees look like a shining star. Thank you for being such a great and cooperative team!"

**Ms. Jo Ann H. Fax**
**Assistant Dean for** Administration & Operations
**Howard University** School of Law

"Thank you again for going out of your way to ensure responsiveness to my request. The AS-A quadrangle looks beautiful and was a perfect site for the HUSOE's *Honors and Awards Ceremony* reception (which hosted nearly 400 students and guests). Please do convey my gratitude to the responsible grounds staff who assisted with making today a special occasion for our graduates and their families!"

**Ms. Leslie T. Fenwick, PhD**
Dean, Howard University School of Education

"This correspondence comes to commend the cleaners who came to AEGD Department for the purpose of cleaning on 10/29/2011. They cleaned high areas and low areas. They cleaned as if they were cleaning for their own homes. I am greatly impressed by the "White Glove" cleaning that was done. They cleaned in a manner that makes me only want **them** to come and clean this Department. Their attitudes were above reproach and very cheerful, totally professional."

**Ms. Brunetta Young**
Dept. of Clinical Dentistry

The Salzburg Global Seminar Mellon Fellow Community Imitative Workshop held on March 30-April 1, 2012 was a success! Please accept my sincere gratitude for the support you provided with this program. Your assistance, coordinating and meeting our facility needs, was invaluable and instrumental in delivering a high quality event. Additionally, thank you for accommodating our late request for Founder's Library. Also, a special thanks to your team who were professional and flexible. The bathrooms were refreshed daily and all trash was collected. The efforts of you your team on this event are immensely

**Ms. Nicole Retland and Ms. Deborah Elliot**
Program Manager
Office of the Provost
Howard University

"I would like to thank you ever so much for following up with the necessary repairs needed after the flood in Rooms 423 and 421. Your continued support to secure (ensure) that our computer lab and class room was functional is very appreciated."

**Ms. Oni Sarah Spratt**
Office Manager/Administrative Assistant
Department of African Studies

"Thank you for responding so quickly to my request for custodial service....You have never failed to get the job done during the 3 C's/ Commencement/Charter Day/Convocation.  For this I am eternally grateful."

**Ms. Odessa W. Scott**
Administrative Coordinator to the Associate Dean
& Childers Hall Building Manager
Office of the Associate Dean
Division of Fine Arts

"Your service on our campus and to our community has been exemplary!"

**Mr. Alton B. Pollard, III, Dean**
School of Divinity (HUSD)

**C.**     **HU Refuses to Compensate TBC for Work Performed and Realized Gains.**

39.    TBC's claims arise from HUs' failure to pay for agreed upon work that TBC performed for HU, management fees, and Gain Share incentives set forth in the PFMCA – entered into by TBC and HU on February 4, 2013.

40.    A First and Second Amendment to the PFMCA extended the term through August 9, 2014.

41.    A true and correct copy of the PFMCA with Amendments is attached hereto and incorporated herein as **Exhibit "E."**

42.    As stated in the PFMCA, HU was pursuing a physical facilities renewal strategy to deliver safer, cleaner, and more useful facilities for its faculty, staff, and students.  TBC was "the professional facilities manager to oversee this renewal strategy."

43.    The PFMCA identified the "Current Scope of Service" to include the management of Transition Services, HVAC Support, Managed Support Services, Impact Management, and Environmental Resources Management.

44.    The PFMCA also listed an "Expanded Scope," extending TBC's services to the management of HU Grounds, Procurement & Inventory Management, Electrical, Plumbing, Locks, Transportation/Movers, Elevators, Paint Shop, Carpentry, EH&S and Life Safety

Systems.  Each category of service under the Current Scope and Expanded Scope fully defines

TBC's and HU's performance duties.

45.    The successor contract, the MFMCA, is based on TBC's proprietary IFM solution

for integrated facilities management with total outsourcing of labor based on TBC's years of

experience in the industry and with HU.  The MFMCA was executed by SVP Tarola on July 9,

2013 for the term July 1, 2013 through November 12, 2014.  A true and correct copy of the

MFMCA is attached hereto and incorporated herein as **Exhibit "F."**

46.    Under the MFMCA, the scope of work was separated into two distinct phases.

First, "Phase I" encompasses the same scope of work as described in the PFMCA.  Next, HU had

the option to replace Phase I with "Phase II - Transfer of HU Employees to TBC."  Phase II

involved the IFM solution, HU divesting to TBC its Facilities Management ("FM") function with

total outsourcing of its employees to TBC ("IFM Solution")

    a.    **TBC's "Gain Share" Claims**.

47.    TBC is entitled to compensation under the Incentive Bonus Payments or "Gain

Share" provisions of both, the PFMCA and MFMCA, in the amount of $3,130,883.00.  Both the

PFMCA and the MFMCA effectively contained identical provisions for Gain Share.  First, the

PFMCA A1, at Par. 4.2, included the Gain Share provision, whereby TBC and HU agreed to

develop a formula for calculating a Performance Incentive Fee.

1.    The PFMCA A2, at Par. 4.4.1 (a), expressly states:

> TBC shall be entitled to a quarterly incentive bonus for operating
> reductions it achieved in the University's annual FM costs (Incentive
> Bonus).  The parties shall document individual savings or cost
> overruns achieved by shop area or area of functionality.  The Parties
> shall share overall net savings for all shops combined on a 50/50
> basis.

PFMCA, Exhibit F at p. 2.

2.      The PFMCA A2, at Par. 4.4.1 (b), (c), (d), and (e), also define entitlement and billing of

the Gain Share.  This is a two-step process which depends on HU providing TBC with

(b):

> The University's actual costs of providing FM services in fiscal year
> 2013 which shall be determined by the University and incorporated
> within 45 days of execution of the Agreement. The total figure shall
> represent the University Base Year Cost for purposes for calculating
> the Incentive Bonus.

*Id*. at p.2.

48.    With the University's "Actual Base Costs," TBC was directed to produce a

"Financial Savings Summary Report" to compare the previous costs with the "New Costs" to

document the savings achieved for the Gain Share.  The University was then obligated to verify

those New Costs, with the calculated savings added to the Bonus Pool.  Par. 4.4.1 (d) and (e)

provides for a formula for Distributions from the Bonus Pool, with the last payment made in the

last quarter of each contract year.

49.    Pursuant to the Gain Share provisions in both agreements, the parties were to

document savings achieved in each category of service and, TBC would be entitled to a 50%

share in overall net savings.

50.    HU was delinquent in providing this financial information, due in part to key

personnel departures and poor record keeping by HU.

51.    Following many telephonic requests and in person meetings, on or about March 28,

2014, TBC sent letters to HU requesting this information for purposes of calculating the Gain

Share.  A true and correct copy of TBC's Demand for University Base Year Cost financial

information, dated March 28, 2014, is attached hereto and incorporated herein as **Exhibit "G."**

52.   The "University Base Year Cost" data provided by HU to TBC, was not only untimely, but incorrect and intentionally misleading.   HU acted in bad faith by vexatiously, intentionally, and wantonly refusing to keep, maintain, and turnover to TBC the required financial documents to verify Gain Share Payments claimed in the amount of $3,130,883.00.

53.   Moreover, HU failed to act in good faith by its failure to properly administer the agreements by refusing to timely provide the University Base Year Cost.

54.   Under the terms of either, the MFMCA Par. 4.2 or the PFMCA Second Amendment 4.4.1, TBC earned a Gain Share in six key areas of Physical Facilities Management for a total claimed due of $3,130,883.00 (the "Gain Share Claim") as follows:

a)   Waste Management Contract - TBC negotiated a new contract with Waste Management representing an annual savings of $545,886.00.   $272,943.00 claimed by TBC.

b)   A&E Termination Plan - HU mandated a "Reduction in Workforce" for 2014. Based on TBC's recommendations and advice, HU reduced its staff by five full time employees for a savings of $434,262.57.   $217,131.00 claimed by TBC.

c)   PFM and CAD Leadership Change - When HU's Chris Calhoun resigned, HU asked TBC's Dennis Forrest to assume his responsibilities.   When HU's Chief Architect Alan Brangman resigned, HU asked TBC Forrest to assume those additional responsibilities, including management of A&E Services, (Architectural and Engineering) Sustainability, Finance and Accounting for Facilities, and Parking and Transportation Services.   Total savings for HU in the amount of $563,200.00 (compensation for two full-time HU employees). $281,600.00 claimed by TBC.

d)   Elevator Certification - Fine avoidance on 98 elevators, which had not been certified for 25 years. Penalty estimated $759.00 per elevator times 25 years, totaling $1,859,550.00.   $929,775.00 claimed by TBC.

e)   Honeywell – In his capacity as the Head of HU FM Facilities, TBC Forrest strongly recommended to HU that the final payment of $1,858,868.00 be withheld due to the failure of the contractor to complete all deliverables. $929,434.00 claimed by TBC.

f)   College of Pharmacy Drug Facility - Avoidance of further wasted expenditure in unsuitable location due to steam tunnel below the surface of the building

producing high humidity and bug infestations.   National Institute of Health ("NIH") gave HU $ 3 million grant to build the facility. HU was going to use $1,000,000.00 of cash to repair moisture damage and complete the building, but the FDA would never would have approved facility for drug manufacturing. $500,000.00 claimed by TBC.

55.     HU was contractually obligated, under the terms of the MFMCA and the PFMCA, to produce to TBC its "University Base Year Cost" for 2013 and 2014 for purposes for calculating TBC's Gain Share or "Incentive Bonus" entitlement. This was never done.

56.     For the years ending 2013 and 2014, TBC was to prepare for HU a "Financial Savings Summary Report" to compare University Base Year Costs with the New Costs to document the savings achieved by Gain Share work.   TBC could not produce the required "Financial Savings Summary Reports" because HU never produced the required "University Base Year Cost" documents.

57.     TBC's Gain Share Savings calculations are based on TBC's working knowledge of HU's vendor's invoices paid for all services in the years ending 2013 and 2014, which TBC managed for HU.

58.     By TBC's calculations it is entitled to $3,130,883.00 (the "Gain Share Claim") as follows:

   a)   Waste Management - Completed October 2013 - $272,943.00;

   b)   A&E Termination Per TBC Plan- Competed December 2014 - $217,131.00;

   c)   PFM and CAD Leadership Change – Completed December 2014 - $281,600.00;

   d)   Elevator Certification – Certificated Obtained July 2014 - $929,775.00;

   e)   Honeywell College of Medicine (Final PMT Issue) - Payment withheld $929,434.00;

   f)   College of Pharmacy Drug Facility-Payment withheld $500,000.00.

b.      **TBC's "Out of Scope Claim."**

59.      TBC is also entitled to compensation for "Out of Scope Work" in the amount of

$4,233,430.00.  Work performed under the "Out of Scope Claim" was not included in either the

"Current Scope" or "Expanded Scope," as those terms are defined in the PFMCA or the

MFMCA.

60.      TBC performed, at HU's explicit direction, "Out of Scope" work at a prearranged

amount for a 7.5% management fee for a total amount claimed of $4,233,430.00[3] as follows:

a) Parking Management Project costs:  $159,826.00 - The fee due TBC is $11,987.00); (based on 7.5% annual personnel costs);

b) A&E and CAD Management Project costs:  $1,343,688.00 - The fee due TBC is $100,777.00 (based on 7.5% annual personnel costs);

c) 2014 Summer Readiness Project costs:  $5,493,453.00 – The fee due TBC is $412,009.00 (based on 7.5% of managed costs);

d) Residence Hall Roof Project costs:  $ 3,346,871.00 - The fee due TBC is $251,015.00 (based on 7.5% of managed costs);

e) College of Medicine Project Management Project costs:  $1,899,000.00 – The fee due TBC is $142,425.00 (based on 7.5% of managed costs);

f) New Construction Management Project costs:  $20,899,010.00 - The fee due TBC is $1,567,426.00 (based on 7.5% managed costs); and

g) Utility Management Project costs:   $23,303,883.00 - The fee due TBC is $1,747,791.00 (based on 7.5% of managed costs).

61.      Pictures of TBC's work are attached hereto and incorporated herein as **Exhibit "H."**

---

[3] Excluded from the calculation are TBC's 2013 Summer Readiness Project costs: $3,454,765.00 – The fee due TBC was $259,107.00 (based on 7.5% annual managed costs);

62.     The following are illustrative examples of TBC's "Out of Scope" work performed on the residence halls and research center in 2014, at HU's express request and direction.







c.   **Phase II – Unrealized Outsourcing Savings**.

63.   TBC seeks further damages in the amount of $3,188,000.00 for its actual costs and lost profits, measured as lost Gain Share incentives from Phase II of the MFMCA, arising from HU's tortious bad faith in refusing to proceed with plans to activate Phase II of the MFMCA. Phase II involved HU divesting to TBC its FM function with total outsourcing of its employees to TBC.

64.   Triggering Phase II of the MFMCA would have resulted in approximately $6,376,000.00 in savings for HU – entitling TBC to 50% of the reduction achieved. HU induced TBC to incur expenses in planning for full outsourcing under Phase II.

65.     Based on information and belief, HU's Board of Trustees and General Counsel approved the MFMCA Phase II IFM, fully integrated outsourced solution to TBC.

66.     When TBC submitted its plans for IFM, it responded to a November 15, 2013 RFP that contained a "confidentiality and nondisclosure agreement" designating all submissions would be proprietary and treated confidential.

67.     HU used TBC's confidential and proprietary submissions and released them without permission to third parties, who then used TBC's information for their benefit.  HU's actions were done in bad faith and interfered with the triggering of the MFMCA IFM.

**d.     Contract Amounts for Demobilization and Management Fees.**

68.     TBC has not been compensated for management fees, due under the MFMCA, in the amount of $400,000.00 earned from August 9, 2014 to November 12, 2014.

69.     Additionally, TBC asserts an undisputed claim for compensation in the amount of $221,648.00 for demobilization and transition costs as agreed upon in the Liquidated Damages provision of the Second Amendment to the PFMCA.

70.     A true and correct copy of TBC's September 30, 2014 Invoice for Demobilization Costs with complete back-up and FEDEX proof of delivery by October 1, 2014, is attached hereto and incorporated herein as **Exhibit "I."**

71.     Although the amount of this claim is undisputed, as previously mentioned, HU has vexatiously and stubbornly refused to pay this amount.  HU has represented that no amount will be paid until there is a global resolution of all claims.

e.     **Unrealized Gain Share Incentives – Howard University's Bad Faith Performance of The MFMCA Phase II – Specifics.**

72.     Based on information and belief, as early as January 31, 2013, but certainly by April 26, 2013, HU and TBC reached an understanding regarding the terms of the MFMCA, whereby TBC would eventually assume full responsibility for labor and management of HU's physical facilities maintenance.

73.     Based on course of conduct, wherein SVP Tarola executed the PFMCA and Amendments 1 and 2, on July 9, 2013, SVP Tarola also executed the MFMCA on behalf of HU. TBC continued its efforts to prepare for the onboarding of HU employees and other cost-saving initiatives and solutions.

74.     Based on information and belief, on or about September 26, 2013, HU former General Counsel confirmed to the Real Estate Committee of the HU Board of Trustees ("the HU Board") that there was nothing legal or operational that prevented this action from moving forward.  Thereafter, the HU Board reiterated its directive to proceed with the full outsourcing of HU employees to TBC.

75.     HU administration failed to follow HU Board directives and did not proceed with the full outsourcing of HU employees to TBC under Phase II of the MFMCA.

76.     Instead of triggering Phase II of the MFMCA, HU administration used TBC's confidential plans for IFM, including its organizational charts and operational plans, and included them in another RFP to outside vendors.

77.     In October 2013, President Ribeau tendered his resignation.  One week later, SVP Tarola resigned effective November 2013.  Subsequently, HU hired Dr. Wayne Frederick,

former HU Provost and Senior Vice President of Health Sciences to serve as HU's Interim President.

78.     Although TBC received many accolades from HU during President Ribeau and SVP Tarola's tenure, after their departure in late 2013, TBC was not given fair consideration in the November 2013 RFP process for HU's PFM.  HU awarded the work to another vendor.

79.     Based on information and belief, HU breached its confidentiality agreements and shared TBC's valuable and proprietary information for operating IFM with third parties.

80.     Although TBC performed with every expectation of payment, TBC was never paid for its Gain Share or Out of Scope work.  Further, TBC was never paid for demobilization and preparation for Phase II, and has suffered considerably from reliance on representations made by HU that TBC would be awarded full IFM.

81.     TBC made its First Demand for Payment on July 1, 2014, by and through its General Counsel Ronald J. Freeman, Sr., and its Second Demand for Payment on February 18, 2015.  No payments have been made to date.

82.     True and correct copies of TBC's July 1, 2014 First Demand for Payment and TBC's February 18, 2015 Second Demand for Payment are attached hereto and incorporated herein as **Exhibits "J" and "K."**

**COUNT I**
**(Breach of Contract - PFMCA and the MFMCA**
**The Gain Share Entitlements.)**

83.     TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 82 as if fully set forth herein.

84.     The Gain Share provisions at MFMCA Par. 4.2, and PFMCA Second Amendment 4.4.1, provide for compensation to TBC upon documented cost savings.  HU had a duty to

perform those provisions in good faith, including production of "University Base Year Cost," to allow for verified calculations of cost savings.

85.     At or around March 28, 2014, TBC demanded HU produce the "University Base Year Cost" for 2013 and 2014.

86.     HU's failure to provide the University Base Year Costs excuses TBC's contractual duty to invoice TBC for its Gain Share work on a timely basis as set forth in the terms of the MFMCA and PFMCA.

87.     HU's failure to provide its University Base Year Costs further excuses TBC's contractual duty to provide Financial Savings Summary Reports and any other conditions precedent to payment for Gain Share work performed pursuant to MFMCA Par. 4.2 or the PFMCA Second Amendment 4.4.1.

88.     Further, under the circumstances, TBC's invoicing for Gain Share work on or about July 1, 2014 and again in February 18, 2015, was reasonable in light of HU's failure to provide these needed Base Year Cost documents.

89.     HU's refusal to compensate TBC under the Incentive Bonus Provision (Gain Share) of MFMCA Par. 4.2 or the PFMCA Second Amendment 4.4.1, constitute a breach of the agreements between the parties, and TBC has been damaged thereby.

90.     TBC has been damaged in an amount not less than $3,130,883.00 due to HU's breach of the Gain Share entitlements under the PFMCA and MFMCA.

## COUNT II
### (Breach of Contract – Failure to Pay Management Expenses and Demobilization Expenses Under PFMCA and MFMCA.)

91.     TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 90 as if fully set forth herein.

92.     HU had a contractual duty, under PFMCA Par. 4.3, to pay TBC's actual demobilization costs, for a total not to exceed of $250,000.00.   Based on that contractual provision, on September 30, 2014 TBC submitted **Exhibit "I,"** its Invoice for its actual Demobilization Costs in the amount of $221,648.00, along with detailed documentation supporting the request.  To date, HU has refused, in bad faith, to pay this amount.

93.     HU had a contractual duty, under MFMCA Par. 4.1, to pay TBC's actual Management Fees in a minimum actual amount of $125,000.00 per month for the period August 9 through November 9, 2014, for a total of $400,000.00.

94.     TBC has made reasonable demand for TBC's actual and reasonable demobilization costs and its management fees, but HU has refused payment, although TBC has performed all conditions precedent and subsequent pursuant to the terms of the PFMCA and MFMCA and nothing excuses HU's performance.

95.     HU is in breach of its duty to pay TBC its management fee, pursuant to MFMCA Par. 4.1, and its actual Demobilization Costs, pursuant to PFMCA Par. 4.3.  As a result, TBC has been damaged thereby in the amount not less than $621,648.00.

### COUNT III
### (Breach of Oral Contract - 7.5% Management Fee For "Out of Scope Work.")

96.     TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

97.     TBC performed "Out of Scope Work" for HU for compensation at the rate of 7.5% of the total managed dollar amounts.  The total value of the "Out of Scope Claim" is $4,233,430.00.   TBC performed, at HU's express request, and always with an express

understanding of receiving payment above and beyond the amounts set forth in the PFMCA and the MFMCA.

98.    In each instance, TBC performed "Out of Scope Work" on demand for HU at the agreed upon rate of 7.5% of the total managed dollar amounts.  In each instance, there was an offer, an acceptance, assent, and performance with full expectation of payment pursuant to those terms.

99.    TBC performed as promised, and HU accepted the benefits conferred by TBC performance of the "Out of Scope Work."

100.    In each instance, the "Out of Scope Work" was performed free from defect and HU did not reject any part of TBC performance nor did HU complain.  TBC performed as requested, yet HU has refused to compensate TBC the contracted for amount of $4,233,430.00 "Out of Scope Work."

101.    HU is in breach of its oral contracts and agreements to pay TBC 7.5% management fee for "Out of Scope Work," and TBC has been damaged in the amount of $4,233,430.00.  TBC demands payment from HU in an amount to be determined at a trial by jury, but not less than $4,233,430.00.

## COUNT IV
### (Alternatively, Unjust Enrichment "Out of Scope Work Claims.")

102.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 101 as if fully set forth herein.

103.    TBC furnished valuable services including the aforesaid "Out of Scope Work Claim" and those services conferred a benefit on HU.

104.    The "Out of Scope Work Claim" performed by TBC conferred a benefit of $4,233,430.00 to HU based on the reasonableness of the 7.5% management fee.  Further, HU has been unjustly enriched and it thereby has a duty to compensate TBC for the value conferred by those benefits.

105.    TBC thereby demands compensation under the equitable theory of Unjust Enrichment for its "Out of Scope Work Claims" in the amount of the value conferred upon HU, to be determined at a trial, but not less $4,233,430.00 or the reasonable value of the services rendered.

### COUNT V
### (Alternatively, Quantum Meruit for TBC's "Out of Scope Work Claims.")

106.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 105 as if fully set forth herein.

107.    TBC's "Out of Scope Work Claim" is for work performed for HU, beyond the scope of either the PFMCA and MFMCA, at HU's request and under HU's supervision.

108.    HU accepted the "Out of Scope Work" and had a duty to compensate TBC for the reasonable value of the services rendered in the amount of $4,233,430.00 based on the reasonableness of the 7.5% management fee for TBC's construction management services.

109.    TBC hereby demands equitable recovery under a theory of quantum meruit for its Out of Scope Work Claims" in the amount of $4,233,430.00 for the reasonable value of services rendered to HU, to be determined at trial, but not less than $4,233,430.00.

## COUNT VI
### (Negligent Misrepresentation - MFMCA – Phase II – Lost Profits – Unrealized Gain Share and Costs of Preparation)

110.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 109 as if fully set forth herein.

111.    Phase II, under the MFMCA, consisted of the Transfer of Facilities Management Employees.    Upon initiation of Phase II by HU, certain union and nonunion facilities management employees were to become employees of TBC.

112.    From January 30, 2013, various members of HU represented to TBC that it intended to trigger Phase II and TBC reasonably relied on HU's representations to its detriment, incurring necessary and reasonable expenses related to commitment of its management team, labor, officers, research and development of personnel, and other preparations in reliance on those representations.

113.    Additionally, TBC reasonably expected compensation from performance of Phase II.  TBC expected that performance of Phase II would yield a profitable Gain Share to HU and that TBC would share in the profit of the gain share under the formula set forth in the MFMCA. TBC should be compensated for lost profit regarding HU's failure to trigger Phase II.

114.    TBC complied with HU's directives regarding the outsourcing of personnel for Phase II of the MFMCA and PFMCA and demands recovery for damages from acting in reasonable reliance on those directives in an amount not less than $3,188,000.00, to be determined at trial by a jury, including lost profits based on Gain Share, and has supported its claims with specific calculations attached to its Demand Letter of February 18, 2015.

## COUNT VII
### (Negligent Misrepresentation – TBC's "Gain Share Claims.")

115.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 114 as if fully set forth herein.

116.    The PFMCA and the MFMCA Incentive Bonus provisions required HU to disclose "University Base Year Cost" for 2013 and 2014.  This information was material to the Gain Share provisions of the MFMCA and PFMCA, and to calculation of TBC's "Gain Share Claims."

117.    HU knew any information relevant to "University Base Year Cost" was material to the assessment of TBC's entitlements under the Incentive Bonus, and HU had a duty to maintain information related to determining the "University Base Year Cost."

118.    TBC was justified in relying on any information received from HU, as it was required by the terms of the MFMCA and the PFMCA.

119.    HU falsely or negligently misrepresented the University Base Year Cost, or supplied materially false or misleading information.

120.    TBC believes this information was intentionally destroyed or discarded in violation of generally accepted rules of accounting against spoliation of records and evidence.

121.    TBC was damaged by HU's negligent misrepresentation University Base Year Cost for 2013 and 2014 necessary for verifiable "Gain Share Claims," and TBC has been damaged thereby in an amount to be determined by  a jury at trial, but not less than $3,130,883.00, the amount of the "Gain Share Claims."

## COUNT VIII
### (Negligent Misrepresentation – TBC's Out of Scope Work Claims.)

122.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 121 as if fully set forth herein.

123.    HU negligently and falsely represented to TBC that it would receive compensation for its "Out of Scope Work Claims," performed by TBC under the leadership of Dennis Forrest, at the express direction of SVP Tarola.

124.    HU knew TBC would rely on HU's representations that it would receive payment for its "Out of Scope Work Claims," and TBC reasonably relied on HU's representations.

125.    TBC has been damaged by acting in reasonable reliance on HU's negligent misrepresentations regarding payment for "Out of Scope Work Claims," in an amount to be determined by a jury at trial, but not less than $4,233,430.00.

## COUNT IX
### (Tortious Bad Faith – Intentional and Vexatious Failure to Preserve Required Financial Records for Gain Share Incentives and To Perform Contractual Obligations in Good Faith.)

126.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127.    Under the terms of either the MFMCA Par. 4.2 or the PFMCA Second Amendment 4.4.1, TBC could earn a Gain Share incentive for performing work at a Cost Savings to HU. To determine the Cost Savings, there was an agreed upon contractual formula requiring HU to preserve and share with TBC, the "University Base Year Cost" for Y-2013 and Y-2014. HU had a duty to perform these financial reporting terms in good faith.

128.    HU, through its officers, employees and agents, acted in bad faith in performance of financial reporting requirements of the Gain Share Incentive provisions of the PFMCA and the MFMCA to the harm and detriment of TBC.

129.    HU's financial records were recklessly and wantonly destroyed, intentionally destroyed, or have been withheld vexatiously, preventing TBC from performing the necessary for calculation of Gain Share awards.

130.    Alternatively, HU's financial records are so incompetently maintained and so grossly and negligently prepared as to misrepresent its actual financial condition or misstate the truth.

131.    HU could have reasonably foreseen TBC would suffer direct and consequential damages, including attorneys' fees, as a direct result of its intentional failure to maintain business records necessary for TBC to calculate the contractual Gain Share awards.

132.    As a direct and proximate result of HU's intentionally tortious bad faith in vexatiously failing or refusing to perform the gain share provisions of the contract, especially the production and preservation of financial information, TBC has suffered direct and consequential damages including economic damages, lost profits, and attorneys' fees in an amount not less than $3,188,000.00, or that amount to be determined by a jury at trial.

## COUNT X
### (Tortious Bad Faith – Intentional and Vexatious Failure to Perform Phase II – Full Outsourcing of Labor.)

133.    TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

134.    HU acted in bad faith when it intentionally and vexatiously failed to trigger Phase II of the MFMCA and PFMCA, after TBC developed its own proprietary plan for IFM for HU

based on its years of industry expertise and experience with HU. TBC performed many of the preparations for implementation of Phase II, and reasonably relied on HU's express intentions of proceeding with a fully outsourced solution.

135.   HU acted in bad faith when it intentionally and vexatiously misappropriated TBC's valuable and proprietary plans for IFM and gave them to third parties, after HU promised that TBC's valuable and proprietary plans would remain protected and confidential materials.

136.   HU acted in bad faith when it intentionally and vexatiously shut out TBC from the procurement process and did not give TBC fair and adequate consideration in a November 2013 RFP that resulted in an award of IFM to another vendor.

137.   After the award to another vendor and the misappropriation of TBC's proprietary plans, HU acted in bad faith when it vexatiously refused to pay TBC for the undisputed portions of TBC claims; the demobilization costs.

138.   HU could have reasonably foreseen TBC would suffer direct and consequential damages, including attorneys' fees, as a direct result of its intentional failure trigger Phase II, instead awarding the business to another vendor after misappropriating TBC's confidential, valuable, and protected proprietary plans for IFM.

139.   As a direct and proximate result of HU's intentionally tortious bad faith in vexatiously failing or refusing to trigger Phase II, after misappropriating TBC's confidential, valuable, and protected proprietary plans, TBC has suffered direct and consequential damages including economic damages, lost profits, and attorneys' fees in an amount not less than $3,188,000.00 and at least $54,245.99 (attorneys fees to date), or that amount to be determined by a jury at trial.

## COUNT XI
### (Breach of Implied Covenant of Good Faith and Fair Dealing in Performance of the MFMCA and PFMCA Gain Share Agreements and Phase II

140.   TBC re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 139 as if fully set forth herein.

141.   In encouraging TBC's performance under the MFMCA and PFMCA, HU impliedly agreed that HU would perform its contractual obligations in good faith, and with fair dealing. TBC reasonably relied on HU's implied covenant of good faith and fair dealing in performing the MFMCA and PFMCA.

142.   HU breached its implied covenant of good faith and fair dealing when it failed to perform its contractual obligations under the Gain Share provisions of the MFMCA and PFMCA, including the duty to retain and share financial records, and the duty to compensate TBC for work performed pursuant the Gain Share provisions of those agreements.

143.   HU further breached its implied covenant of good faith and fair dealing when it induced TBC's preparations for MFMCA Phase II, the full outsourcing of HU's facilities workers to TBC, then failed to trigger the actual term of the agreement.  Further, HU conducted an RFP for the fully outsourced work and excluded TBC from the procurement process.

144.   HU continued to breach its implied covenant of good faith and fair dealing with TBC by encouraging TBC's preparations for Phase II, then misappropriating TBC's proprietary plans and allowing them to be used by another vendor who was eventually awarded the new contract for the fully outsourced IFM work.

145.   HU could have reasonably foreseen TBC would suffer direct and consequential damages, including attorneys' fees, as a direct result of its breach of good faith and fair dealing, including its failure to perform its contractual obligations under the MFMCA and PFMCA to

compensate TBC for Gain Share work, and to trigger Phase II. Instead HU awarded the business to another vendor after misappropriating TBC's confidential, valuable, and protected proprietary plans for IFM.

146.     TBC has suffered direct and consequential damages flowing from HU's breach of its implied covenant of good faith and fair dealing in the performance of the MFMCA and PFMCA, including economic damages, lost profits, and attorneys' fees in an amount not less than \$3,130,883.00 (Gain Share) and \$3,188,000.00 (Phase II - unrealized gain share) and at least \$54,245.99 (attorneys fees to date), or that amount to be determined by a jury at trial.

WHEREFORE, TBC requests that this Court enter judgment in favor of TBC and against HU in the amount of **\$12,736,691.73** in principal, interest and attorneys' fees as follows:

(a)    In Count, I, TBC seeks damages for its Breach of Contract - PFMCA and MFMCA "Gain Share Claims" against HU in the amount of \$3,130,883.00; and

(b)    In Count II, TBC seeks damages for its Breach of Contract - Management and Demobilization Fees claim against HU in the amount of \$621,648.00; and

(c)    In Count III, TBC seeks damages for its Breach of Oral Contract - "Out of Scope Work Claims" against HU in the amount of \$4,233,430.00; and

(d)    Alternatively, in Count IV, TBC seeks damages for its Unjust Enrichment - TBC's "Out of Scope Work Claims" against HU in an amount not less than \$4,233,430.00; and

(e)    Alternatively, in Count V, TBC seeks damages for its Quantum Meruit - TBC's "Out of Scope Work Claims" against HU in an amount not less than \$4,233,430.00; and

(f)    Alternatively, in Count VI, TBC seeks damages for its Negligent Misrepresentation - TBC's Lost Profits, Gain Share and Costs of Preparation claim against HU in an amount not less than \$3,188,000.00; and

(g)   Alternatively, in Count VII, TBC seeks damages for its Negligent Misrepresentation - TBC's "Unrealized Gain Share Claims" against HU in an amount not less than $3,130,883.00; and

(h)   Alternatively, in Count VIII, TBC seeks damages for its Negligent Misrepresentation - TBC's Out of Scope Claims against HU in an amount not less than $4,233,430.00; and

(i)    In Count IX, TBC seeks damages for Tortious Bad Faith - Failure to Preserve Financial Documents for Gain Share against HU in an amount not less than $3,188,000.00; and

(j)    In Count X, TBC seeks damages for Tortious Bad Faith - Failure to Trigger Phase II - Full Outsourcing of Labor - Misappropriation of Plans against HU in an amount not less than $3,188,000.00; and

(k)   In Count XI, TBC seeks damages for Breach of the Implied Warranty of Good Faith and Fair Dealing-Performance of Gain Share and Phase II of the MFMCA and PFMCA against HU, in an amount not less than $3,188,000 plus $3,130,833; and

(l)    TBC further seeks an award of Interest in the amount of at least $1,508,484.74 at the rate of 6% per annum ($1,768.45 per diem) to run from July 1, 2014, the date of its First Demand Letter until paid, its reasonable and necessary attorneys' fees in the amount of at least $54,245.99, costs, and any such other and further relief as this Court deems fair and proper against HU.


**TBC DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 21ˢᵗ day of November, 2016          Respectfully submitted,

**SHULMAN, ROGERS, GANDAL,
PORDY & ECKER, P.A.**

/s/
Kristin E. Draper
DC Bar No. 985708
12505 Park Potomac Avenue, Sixth Floor
Potomac, Maryland 20854
(301) 230-5200
(301) 230-2891 (facsimile)
kdraper@shulmanrogers.com

*Local Counsel for Plaintiff*
*THE BURKS COMPANIES, INC.*

**Litigation Counsel for The Burks Companies, Inc.**

RONALD J. FREEMAN, SR., *pro hac vice application submitted*
Georgia Bar No. 276315
CATHY R. NASH, *pro hac vice application submitted*
Georgia Bar No. 534934
BETHANY WHITE, *pro hac vice application submitted*
Georgia Bar No. 720893
JOHNSON & FREEMAN, LLC
6323 Roosevelt Highway.
Union City, Georgia 30291
(404) 873-0093
(404) 873-2311 Facsimile
Email: rfreeman@jfllc.com
        cnash@jfllc.com
        bwhite@jfllc.com